1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF WEST VIRGINIA

3                        - - -

4   UNITED STATES OF AMERICA,

5              Plaintiff,

6              VS.          CRIMINAL ACTION NO.  2:15-cr-3

7   JONATHAN SCHRADER,              TESTIMONY OF GREG PERRY

8              Defendant.

9                        - - -

10        Excerpt of the proceedings had in the plea hearing of the

11   above-styled action on April 6, 2015, before Honorable John S.

12   Kaull, Magistrate Judge, at Elkins, West Virginia.

13                        - - -

14        APPEARANCES:

15        On behalf of the United States of America:

16              Paul T. Camilletti, Esq.
                Assistant United States Attorney
17              217 West King Street, Suite 400
                Martinsburg, West Virginia  26003
18              (304) 262-0590

19        On behalf of the Defendant:

20              Brian J. Kornbrath, Esq.
                Federal Public Defender
21              230 West Pike Street, Suite 360
                Clarksburg, West Virginia  26302
22              (304) 622-3823

23   The Defendant was present in person.

24   Proceedings recorded utilizing tape.
     Transcript produced by computer-aided transcription.
25

                Linda Mullen, RDR, CRR

```
 1            MR. CAMILLETTI:  Your Honor, we'll call Special Agent
 2   Greg Perry.
 3            THE COURT:  Special Agent Perry, if you'll come
 4   forward, be sworn by the clerk and then assume the witness
 5   chair.
 6            GREG PERRY, GOVERNMENT WITNESS, SWORN
 7            THE COURT:  Mr. Camilletti, you may inquire.
 8            MR. CAMILLETTI:  Thank you.
 9                       DIRECT EXAMINATION
10   BY MR. CAMILLETTI:
11   Q.   All right, sir.  In a nice loud voice, would you tell The
12   Court your name.
13   A.   Gregory R. Perry.
14   Q.   And your occupation?
15   A.   I'm a special agent with the Bureau of Alcohol, Tobacco
16   and Firearms.
17   Q.   Where are you posted?
18   A.   Clarksburg, West Virginia.
19   Q.   Have you become familiar with the investigation involving
20   this defendant, Mr. Jonathan Schrader?
21   A.   Yes.
22   Q.   How did Mr. Schrader come to your attention?
23   A.   On February the 9th, 2015, I got a call from Randolph
24   County Sheriff Mark Brady.  And Mark told me that one of his
25   deputies was transporting a juvenile to the Chick Buckbee
```

 1   Juvenile Detention Center in Romney, West Virginia.  The
 2   juvenile's name was Jordan Sayre.
 3       Sheriff Brady went on to tell me that Mr. Sayre had told
 4   his deputy on the way to the detention center that a couple of
 5   friends of his, Luke Hempel, who is another juvenile, and
 6   Jonathan Schrader had in their possession some C4.  Mr. Sayre
 7   went on to explain that Luke Hempel had stolen the C4 from his
 8   father, John Hempel, and had transferred that C4 to Jonathan
 9   Schrader.
10       Mr. Sayre went on to say that Hempel and Schrader had
11   devised a plan to utilize the C4 to blow up the federal
12   building that we're here in today, and the Davis Trust Bank in
13   Elkins, West Virginia.
14       The following day, a local FBI agent out of Romney, West
15   Virginia, went and spoke with Juvenile Sayre, and Sayre
16   maintained the same story that he had told the deputy the day
17   before.
18       A couple of days later, February the 12th, 2015, myself,
19   Trooper Keplinger, FBI Agent Farrell -- no, strike that -- just
20   myself and Trooper Keplinger went and interviewed John Hempel
21   and -- to inquire about whether or not any of this could
22   possibly be true.  Mr. Hempel advised that in fact he did have
23   some C4 at one time.  Two, one-and-one-quarter pound box of C4.
24   But contended that he didn't think his son, Luke Hempel, had
25   gotten it because he remembered that he destroyed the C4

1   approximately ten years ago by burning it.

2       I asked Mr. Hempel if he would give me permission to go

3   interview his son, who was currently at the Lorrie Yeager Youth

4   Detentional -- Youth Detention Center in Parkersburg, West

5   Virginia.

6       Myself, Trooper Keplinger, who is a bomb tech with the

7   West Virginia State Police, and Special Agent Farrell of the

8   FBI, on the 13th of February went to the juvenile correctional

9   facility in Parkersburg and interviewed Luke Hempel.

10      Luke, among other things, told us that his dad did have C4

11  and a number of other types of explosives.  And that

12  Jonathan -- well, he claimed that Jonathan Schrader was very

13  familiar with his residence.  In fact, Jonathan Schrader used

14  to baby-sit him when he was a child and was very familiar with

15  his father's residence.  And went on to say that Johnson

16  Schrader had actually stolen a couple of block -- two blocks of

17  C4, along with some blasting caps, and denied any involvement

18  in taking the explosives himself.  He went on to tell me that

19  he believed that Jonathan Schrader had hidden the C4 at his

20  mother's house on Diamond Street in Elkins, in an outbuilding

21  directly behind Daddy's Day Care.

22  Q.   Did you obtain a search warrant to search that location?

23  A.   Yes.  A federal search warrant was obtained and executed

24  on the 13th of February.

25  Q.   At the location described to you?

1    A.   At 66 Diamond Street in Elkins, West Virginia, Cheryl

2    Worch's residence, who is Jonathan Schrader's mother.

3    Q.   Did you encounter this defendant, Mr. Jonathan Schrader,

4    at or during the execution of the search warrant?

5    A.   Yes.   I'm sorry.

6    Q.   I was going to say, did you inquire of him regarding any

7    C4?

8    A.   I did.   I introduced myself to Mr. Schrader and asked him

9    to tell me where he had hidden the C4.   Initially, he denied

10   any knowledge of the C4 but quickly said, I'm sorry, I do know

11   what you're talking about and I'll take you there and point it

12   out to you.

13   Q.   Did he do that?

14   A.   He did that.   He rode back in our vehicle.   When we got

15   back to Ms. Worch's residence, I introduced him to Trooper

16   Keplinger and advised him, Trooper Keplinger, that Mr. Schrader

17   was going to point out the location of the C4.   And he did.

18   Q.   Did you seize the C4?

19   A.   Trooper Keplinger seized the C4, 49 slip-on boosters and

20   two electric blast caps.

21   Q.   The slip-on boosters and electric blasting caps are other

22   material associated with the explosive device?

23   A.   The -- yes, they are.   They are -- they are separate

24   explosive devices.   The C4 itself is very stable and hard to

25   get to go boom.   A blasting cap won't do it in and of itself

Linda Mullen, RDR, CRR

1  generally.  Therefore, you need a slip-on booster to utilize in

2  conjunction with the blasting cap in order to detonate the C4.

3  Q.  Can you describe the C4 that was seized on February 13th,

4  please?

5  A.  Yes.  It was a military grade M112 block of C4,

6  approximately one and one-quarter pound.  And then there was a

7  half bar of the same material, military grade M112 C4, 49

8  slip-on boosters and two caps, two electric blasting caps.

9  Q.  Did you speak to Mr. Schrader about the items that were

10  seized?

11  A.  At length.

12  Q.  And did he advise you of their origin, so far as he knew?

13  A.  Yes.  Mr. Schrader said that Luke Hempel had stolen those

14  from his father, John Hempel, and brought them over to Nate

15  Nine's residence one evening, a location where Mr. Schrader had

16  been staying, and traded them to Mr. Schrader in exchange for

17  the promise for Mr. Schrader to pay Mr. Hempel eight to $900

18  cash, and buy him a 1911 pistol in exchange for the explosives,

19  plus a Smith & Wesson .9-millimeter pistol.

20  Q.  Did you further explore the two stories regarding

21  Mr. Schrader's theft or young Mr. Hempel's theft of the C4

22  explosives?

23  A.  Yes.  I asked Mr. Schrader, you know, are you -- you know,

24  are you sure you didn't go in the residence and take the

25  explosives?  Because I've got some information that that's the

 1   way it went down.  Mr. Schrader denied that, said that, you

 2   know, he had gotten it directly from Luke.  Luke had stolen it

 3   from his daddy, brought it over to the residence.  He obtained

 4   it in ex -- you know, in exchange for his promise to pay the

 5   money and provide Luke with this special 1911 pistol.

 6       Mr. Schrader even went on to say that when Luke had left,

 7   he and Nate Nine had discussed the explosives, and Nate

 8   suggested that he get rid of some of it.  And he, in fact, took

 9   a load, a plastic baggie full of electric blasting caps, and he

10   threw them into the river.

11   Q.   Did you investigate -- in the course of your

12   investigation, did you examine the lockboxes where the C4

13   explosive and other materials had been stored?

14   A.   Yes.  The -- the first interview I did -- that Trooper

15   Keplinger and I did with Mr. Hempel, we asked him if he would

16   show us his magazines.  He was very reluctant but ultimately

17   agreed to do that.  And he said that he didn't have anything in

18   there that he knew of.

19       And when we got up there, he had three magazines and a day

20   box out in the woods behind his house.  Well, the day box

21   didn't have a padlock on it.  And the other two magazines had

22   padlocks, but one of the padlocks looked like it had been cut

23   almost in two with a bolt cut -- set of bolt cutters.

24       And the other magazine had a cheap laminated padlock, not

25   sufficient or conducive to being put on an explosive magazine,

1    which was kind of odd.   And it was newer, which led me to

2    wonder whether that lock had been cut off and replaced with

3    this temporary, cheap lock.

4         But long story short, we were ultimately able to look in

5    the magazines.   Trooper Keplinger seized 62 emulsion sticks,

6    one pound emulsion sticks; 129 electric blasting capping caps;

7    76 and a half feet of detonation cord; and 25 bunch blocks.

8    Q.   That's a seizure on February 12, 2015?

9    A.   That's right.

10   Q.   And separate from the execution of the search warrant on

11   February 13?

12   A.   Separate from that.   That was just in our -- we were in

13   our infancy in the investigation trying to establish the

14   existence of this C4.

15   Q.   Did you confront Mr. Schrader, the defendant, regarding

16   whether he knew the C4 was stolen?

17   A.   I did.   And there was really no issue with regard to that.

18   His position was yeah, he knew it was stolen and that Luke had

19   stolen it from his father, John Hempel, and had transferred it

20   to him.

21   Q.   Do you know where these items, the C4 that was seized,

22   where that was manufactured?

23   A.   Yes, I do.   In fact, folks from our -- our bomb data

24   center traced the C4 and determined that it was manufactured in

25   Shreveport, Louisiana.

1  Q.   All right.  So during the execution of the search warrant,

2  Mr. Schrader acknowledged knowing the location of the C4,

3  showed you the location of the C4, acknowledged that it was

4  stolen, and you seized the C4?

5  A.   Yes.

6  Q.   It has moved in interstate commerce prior to its seizure

7  on February 13th?

8  A.   It would have to have been collected on Diamond Street.

9  Q.   Your investigation continued after that point?

10  A.   It did.

11  Q.   Have you been able to confirm or refute the initial

12  allegation that there was a threat on the federal building?

13  A.   I have certainly not been able to confirm that.  Trooper

14  Keplinger and I have interviewed a number of people in this

15  case trying to get to the bottom of that issue and trying to

16  get to the bottom of where's the other half of the C4 block,

17  and perhaps is there more.  And we have not been able to

18  confirm at all that there was a plan to blow up anything by

19  Mr. Schrader.

20      In fact, everybody that we've spoken to has denied knowing

21  anything about a plan that Mr. Schrader was involved in to blow

22  up the federal building.

23  Q.   The information in that regard came from the initial

24  interview by a juvenile to a Randolph County sheriff's deputy?

25  A.   And followed up with an FBI agent interview on two

Linda Mullen, RDR, CRR

 1   different occasions.

 2              MR. CAMILLETTI:  That's all the questions I have,

 3   Your Honor.

 4              THE COURT:  Mr. Kornbrath.

 5                       CROSS-EXAMINATION

 6   BY MR. KORNBRATH:

 7   Q.   Agent Perry, you would agree that when the criminal case

 8   was first brought to court, it was by complaint, not

 9   indictment?

10   A.   Yes, I would agree with that.

11   Q.   And that was the February 14th, 2015, complaint that was

12   prepared by the local FBI agent you spoke of, right?

13   A.   Yeah.  A day after I interviewed Mr. Schrader, the

14   following day, Valentine's Day.

15   Q.   And it was that complaint that had those very serious

16   allegations, and I'm quoting, plans were afoot to detonate C4

17   explosives in front of the Elkins federal courthouse, also

18   known as the Jennings Randolph Federal Center, and then take up

19   sniper positions to shoot down first responders following the

20   detonation.

21        That was the allegation that the juvenile made, right?

22   A.   That's correct.

23   Q.   And on its face, it's very serious so local, state and

24   federal agents investigated it; correct?

25   A.   Big deal.

                       Linda Mullen, RDR, CRR

1   Q.   All right.  And just to confirm your position, as of

2   today, you do not believe that that allegation has merit or

3   credibility?

4   A.   I don't think it has either.

5   Q.   Okay.  And that includes not only a plan to blow up this

6   very building, but also the follow-up plan to shoot first

7   responders, right?

8   A.   That's correct.

9   Q.   All right.  Luke Hempel, the juvenile, is presently facing

10  criminal charges, correct?

11  A.   I think -- actually, I think he, according to a message

12  that was left at our office by his father that I received via a

13  text message while I was on vacation last week, apparently he's

14  pled guilty in state court to stealing firearms from his

15  father.  I don't know that to be true, but that's what his

16  father claimed.

17  Q.   Okay.  Did he tell you how many firearms the son took from

18  the dad?

19  A.   It's, I think, approximately 21 or 22 firearms, in that

20  range.

21  Q.   All right.  So there are at least allegations out there

22  that Luke has taken things from his father in the past?

23  A.   Well, Luke told me that he had taken his dad's guns.

24  Q.   Okay.  When the search warrant was executed in February at

25  Mr. Schrader's mother's house, he wasn't there at the time,

1    right?

2    A.   He was not there at the time.

3    Q.   Did you get information that he lived locally in Elkins

4    and then you went and talked to him?

5    A.   Yeah.  Luke had told me that he lived in a building in the

6    vicinity of Third Ward -- the old Third Ward schoolhouse.  And

7    I asked -- once I talked to Ms. Worch, when we initially made

8    contact with her to execute the warrant, and she told me that,

9    you know, her son didn't live with her, you know, they were

10   sort of estranged from one another, but thought he was staying

11   somewhere in town, I asked one of the marshals, Terry Moore, to

12   see if he could go down in the vicinity where we believe he had

13   been living and see if he could find him.

14       In a short bit of time, he was able to do that and called

15   me on the phone and said we've got him here.  And I said I'll

16   be right down.

17   Q.   Okay.

18   A.   So that's how that unfolded.

19   Q.   All right.  And you met with Mr. Schrader first at the

20   place he was staying?

21   A.   I met with him at the Third Ward schoolhouse where he was

22   staying.  Introduced myself.  And he could see it was a big

23   deal.  I mean, we had agents from a number of federal agencies,

24   state and local, and he -- you know, he saw that it was an

25   issue.  And fairly quickly told me that, yeah, I do have the

1    C4, I know where it's at, I'll take you where it's at and show

2    you.

3    Q.   That's what caused you all to go back to the mother's

4    house, correct?

5    A.   Correct, with Mr. Schrader in tow.

6    Q.   Did Mr. Schrader walk the law enforcement officer over to

7    where the stuff was being stored?

8    A.   Yes.  When we pulled in, I immediately introduced him to

9    Trooper Keplinger, because he's really the only one qualified

10   there to handle explosives.  So I introduced him to Trooper

11   Keplinger, and Trooper Keplinger took him into the outbuilding.

12   And I didn't go in there.  But Trooper Keplinger took him in

13   there.  Mr. Schrader pointed out, you know, it's there and

14   there.  And went on to say that, you know, there should be

15   three caps and two blocks of C4.

16       There -- there ended up not being what he thought was

17   there.

18   Q.   Right.

19   A.   But in any event, there were -- you know, there was C4

20   recovered.

21   Q.   Do you know whether the C4 and the blasting caps and

22   the -- what was the other term?

23   A.   The slip-on boosters.

24   Q.   -- the boosters, were they all stored together or were

25   they kind of separate in the same area?

1   A.   I didn't see the -- I didn't see it, but I think they were

2   generally in the same proximity with one another.

3   Q.   But were they in the same, like, container or were they

4   like feet part?

5   A.   I don't know.  I don't know the answer to that.

6   Q.   Okay.  You spoke to Mr. Schrader at length?

7   A.   Spoke to him at length that night about, of course, the

8   explosives issue.

9   Q.   Right.

10  A.   And there were -- there's sort of a second part to this

11  case with regard to the stolen firearms.  He was -- he was part

12  of that as well.  So we had a very long conversation, I would

13  say two to three hours.

14  Q.   And you recorded it, right?  It was an audio recording.

15  A.   It was recorded, yes, it was.

16  Q.   All right.  At the end of the investigation that evening,

17  Mr. Schrader was allowed to leave, right?

18  A.   Yes.

19  Q.   He was not taken into custody?

20  A.   No.

21  Q.   Was he driven back to his residence?

22  A.   Yes.

23  Q.   All right.  And I think it was maybe within 24 hours that

24  the federal complaint was obtained?

25  A.   Yes.

1   Q.   And then he was arrested?

2   A.   Yes.

3   Q.   In that short window of time, was there any reason to

4   believe he tried to like leave Elkins or flee the area?

5   A.   No.  Initially -- initially, when we were prepping to

6   execute the warrant, in speaking to the United States

7   Attorney's Office, we were told that there was not going to be

8   an arrest warrant issued.

9   Q.   All right.  That's --

10  A.   And I told Mr. Schrader that, he was not going to be

11  arrested.  The next day, the United States Attorney's Office

12  decided to obtain an arrest warrant.

13  Q.   Do you think that decision was made, at least in part on

14  the -- no pun intended -- explosive allegations that this

15  building was targeted?

16  A.   Probably.

17  Q.   And it was only after that that you had come to find out

18  that allegation had no merit or basis?

19  A.   Yeah.  I truly don't know the real reason why the criminal

20  complaint was obtained.

21  Q.   All right.

22  A.   I assume that that had something to do with it.  They

23  didn't ask me.

24  Q.   Right.

25  A.   So I don't know.

1   Q.    All right.

2                MR. KORNBRATH:   I have nothing else.   Thank you.

3                MR. CAMILLETTI:   No further questions, Your Honor.

4   May the witness is step down?

5                THE COURT:   No.

6                MR. CAMILLETTI:   Okay.

7                            EXAMINATION

8   BY THE COURT:

9   Q.    What would your response have been had they asked you?

10  A.    I would have said not to arrest him.

11        And, Judge, I don't mean to interrupt you, but the reason

12  that I would have said that is because Mr. Schrader was

13  extremely cooperative that night and had agreed to take a

14  polygraph exam, had suggested to take a polygraph exam in order

15  for me to try to get to the bottom of the missing C4 and

16  whether or not there was truly a plot to blow up anything and I

17  knew if he had gotten arrested, I wouldn't ever have the

18  opportunity to do that.

19        So from an investigative standpoint, I would have been

20  opposed to arresting him from that aspect.

21  Q.    The missing C4, what is the basis for stating that you

22  believe there was missing C4?

23  A.    Well, Luke Hempel said there was two blocks of C4.   John

24  Hempel, the owner of the C4, said he had two,

25  one-and-a-quarter-pound blocks of C4.   Two full intact blocks.

                    Linda Mullen, RDR, CRR

1     Jonathan Schrader said there was two full blocks of C4.  We

2     recovered a block and a half from Ms. Worch's residence.  So at

3     a minimum, there's a half a block of C4 still missing.

4          I asked Mr. Schrader about where that C4 was.  He believed

5     that Luke Hempel had gotten mad at him because Jonathan

6     Schrader didn't live up to his end of the bargain in the deal

7     to obtain the explosives.  In other words, he never paid him

8     the eight or $900 he promised to pay him, nor had he bought him

9     the pistol that he promised to get him in exchange for the

10    explosives.

11         So Mr. Schrader's belief was that Luke Hempel had gotten

12    mad at him because of that and had gone in and stolen a half a

13    block.

14         My response to Mr. Schrader was, why wouldn't he have

15    taken it all if he was ticked off at all?  That doesn't make

16    any sense.  That was something that I hoped to reapproach

17    Mr. Schrader on the next day or the following day, perhaps with

18    a polygraph exam, but was never able to do.

19    Q.   This missing C4, are there also missing blasting caps, det

20    cord and the other connectors you talked about?

21    A.   There's -- we believe that there was probably 50 slip-on

22    boosters, a key component to detonating C4.  We recovered 49 of

23    them.

24         Mr. Schrader said he had three blasting caps left.  He

25    claims he dumped a whole bag of them in the river, but he kept

1   three.  We only recovered two, so that means that one blasting

2   cap, one slip-on booster and a half a block of C4 is missing.

3   The three ingredients you need to -- to utilize the C4.

4        My -- my -- sort of my opinion the whole time was that

5   Mr. Schrader, and even Jordan Sayre, the juvenile who got the

6   whole thing started, said that Jonathan Schrader had done a dry

7   run up on Rich Mountain utilizing some of the explosives.  Now,

8   I asked Mr. Schrader that and he denied that.  But that's

9   something else that I hoped to reapproach Mr. Schrader on with

10  a polygraph or another follow-up interview.

11       But you know, when I left him that night, he was -- he had

12  not come off ever utilizing any of the explosives and not

13  having any knowledge where the missing C4 was.  But

14  Mr. Schrader said, I'm willing to take a polygraph.  I'll

15  cooperate in any way I can, which, as an investigator, that's

16  something you want to hear.

17       So you know, that could have been something that could

18  have been explored with the use of a polygraph examination.

19  Q.   Did Mr. Schrader tell you in any of the interviews that

20  you conducted with him why he wanted the C4 in the first place?

21  A.   He said he just wanted it.  In a twisted way, he wanted

22  it.  He also said that at the same time that he wanted it, he

23  didn't want to see his 17-year-old child in possession of this.

24  So he felt it more prudent to take it into his own possession

25  rather than let a 17-year-old kid have it.


                          Linda Mullen, RDR, CRR

1    He also said he had a fascination with wood and that he

2  had cut wood his whole life and that he wanted to utilize

3  explosive material to split and quarter a tree, to see if he

4  could in fact cut the tree up in small usable sections with

5  explosives.

6    Mr. Schrader and I talked at length about him actually

7  using it.  He said, I wanted to, but I never did.

8  Q.    The father of Hempel, what was he doing with military

9  grade C4?

10  A.    Well, when Trooper Keplinger and I first interviewed him,

11  he said that some governmental employee had dropped it off at

12  his house years ago but he couldn't remember who that was or

13  who they worked for.

14    The second time we interviewed him he said that he was

15  conducting a training seminar on Rich Mountain and that a

16  student had brought two blocks of C4 to the class and asked him

17  if he would incorporate it into the class.

18    Mr. Hempel claims that he utilized one of the bars and had

19  kept the other bar for a period of time and then destroyed it.

20  Q.    So there should have been no C4?

21  A.    There should have been no C4.

22  Q.    That obviously isn't true.

23  A.    That's right.

24  Q.    Did he explain why he had boxes to store this stuff in?

25  A.    Well, he owns a company called EEI Geophysical and he does

1   work in sort of the explosives field.  He claims that, for

2   instance, a typical job that he would do would be in a cave

3   where people spelunk in a cave.  And there could be a rock that

4   needs removed and a blasting agent or a blaster would be called

5   in to do that job.  He claims that that's one of the things

6   that is his specialty.

7        Now, I asked our licensing division of ATF to query

8   whether or not he held a license with ATF to possess

9   explosives.  And he didn't.  Trooper Keplinger checked with the

10  fire marshal in the state of West Virginia to see if he had a

11  valid state license, and he doesn't.

12  Q.   Are all the -- well, some questions dealing with the

13  firearms.

14       Were you able to account for the alleged 21 firearms?

15  A.   No.  I believe that we have nine of the 22 firearms in

16  hand, recovered.  There's another one that's -- that I know

17  where it's at, it's out west, that I'll end up getting.  The

18  rest of them are unaccounted for, are into the wind at this

19  point.

20  Q.   Did the elder Mr. Hempel report to the police the ongoing

21  theft of his firearms?

22  A.   Yes.  He did.  He -- it took him a while to even realize

23  that guns were missing from his residence.  And he had spoken

24  to the sheriff's department a time or two about these stolen

25  guns.

1        And I believe around the 9th of February, Luke Hempel

2   actually broke into his father's house and stole an additional

3   11 of the 22 guns on the night in February.  And then of course

4   he reported that theft to the sheriff's department.  And out of

5   those, the 11 plus another additional 11, a total of 22, nine

6   are in hand.  One's out west, which will be in my custody

7   eventually.

8   Q.   I take it Mr. Schrader was never held -- never had any of

9   the guns?

10  A.   He had four of the guns.

11  Q.   Had four of the guns?

12  A.   He had four.  He took two to the gun shop in Elkins, which

13  is an FFL, and sold them.  And he took the other two to

14  Phillips & Sons pawn shop on the other end of Elkins and sold

15  those.  And I have three of those four.  There's a Colt .38

16  revolver that's out west that's --

17  Q.   That's the one that's missing.

18  A.   Yeah.  A local gentleman bought it and gave it to his

19  son-in-law as a gift who lives out west.

20        THE COURT:  Does my questions invoke any additional

21  questions by counsel?

22        MR. CAMILLETTI:  No, Your Honor.  Thank you.

23        MR. KORNBRATH:  Just briefly.

24                    RECROSS-EXAMINATION

25  BY MR. KORNBRATH:

1    Q.    During your interview, Mr. Schrader actually gave you the

2    documentation for the sales?

3    A.    He did, documenting his sale of those four firearms to

4    those two different places.

5    Q.    And his position was basically I needed money so I pawned

6    these?

7    A.    Yes.

8    Q.    Okay.  Thank you.

9              THE COURT:  I'm disturbed that I was asked to issue a

10   warrant for arrest when the officers weren't all on board with

11   that decision.  All right.  You may step down.  Thank you.

12             THE WITNESS:  Thank you, Judge.

13             (Excerpt concluded at 11:56 a.m.)

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                     C E R T I F I C A T E

 2

 3          I, Linda S. Mullen, Registered Diplomate Reporter,

 4   Certified Realtime Reporter and Official Reporter of the United

 5   States District Court for the Northern District of West

 6   Virginia, do hereby certify that the foregoing is a true and

 7   correct excerpted transcript to the best of my ability of the

 8   taped proceedings had in the above-styled action on April 6,

 9   2015, as reported by me in stenotypy.

10          I certify that the transcript fees and format comply

11   with those prescribed by the Court and Judicial Conference of

12   the United States.

13          Given under my had this 17th day of April, 2015.

14                         /s/ Linda S. Mullen
                           Linda S. Mullen, RDR, CRR
15                         Official Reporter, United States
                           District Court for the Northern
16                         District of West Virginia

17

18

19

20

21

22

23

24

25


                        Linda Mullen, RDR, CRR
```